**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES | Criminal No. 3:12-CR-00974-DCN |
| v. | **MOTION FOR VARIANCE AND/OR IMPOSITION OF REASONABLE SENTENCE AND MEMORANDUM IN SUPPORT THEREOF** |
| JONATHAN N. PINSON | |

COMES NOW, Defendant Jonathan Pinson, by and through his undersigned counsel, and hereby moves the Court to grant Pinson a variance from the established guideline range and/or afford Pinson a reasonable sentence based on and pursuant to 18 U.S.C. § 3553 (2006). Pinson submits that a variance is supported by a close examination of Pinson's personal situation in concert with the factors contained in 18 U.S.C. § 3553 such that a sentence below the guideline range is appropriate, reasonable and lawful.

## INTRODUCTION

Pursuant to United States v. Booker, 543 U.S. 220 (2005), the federal sentencing process requires a two-step approach. See Fed. R. Crim. P. 11(M), amended December 1, 2007. First, the district court must calculate the proper sentencing range prescribed by the Federal Sentencing Guidelines ("Guidelines"). Gall v. United States, 552 U.S. 38, 48-50 (2007); United States v. Evans, 526 F.3d 155, 160-61 (4th Cir. 2008). The district court must then consider that range in

light of the parties' arguments regarding the appropriate sentence and the factors set out in 18 U.S.C. § 3553(a), before imposing its sentence. Gall, 552 U.S. at 50.

Though the Guidelines are the "starting point and the initial benchmark, [they] are not the only consideration." Id. at 596. A district court may *not* "presume that the Guidelines range is reasonable." Id. at 596-97 (emphasis added); see also, Rita v. United States, 551 U.S. 338, 349 (2007). Instead, the district court must "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate" and "then consider *all* of the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall, 552 U.S. at 49 (emphasis added); see also, Kimbrough v. United States, 552 U.S. 85, 85 (2007) (reiterating that the "Guidelines range" is just one of "the array of factors warranting consideration" by the sentencing judge). In each case, the court "must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 50. A district court may reject a sentence within the advisory Guidelines range because "the case at hand falls outside the 'heartland' " to which the individual Guidelines apply or because a sentence within the Guidelines fails to reflect the other § 3553(a) factors or "because the case warrants a different sentence regardless." Rita, 551 U.S. at 349; Evans, 526 F.3d at 160-61.

## I.   GUIDELINE CALCULATION

The advisory guideline calculations contained in the Pre-Sentence Report (PSR) incorporate the Government's incorrect financial claims and improperly tag Pinson with the label of organizer and leader of a criminal organization having five or more participants. As explained below, the correct sentencing guideline calculation should result in an advisory sentencing range of between 63-78 months in prison based upon an offense level of 26 and a Criminal History Category of I.

### A. Correct Guideline Calculation for Count 1 Rico Conspiracy

Pinson was convicted of one count of RICO conspiracy (Count 1), two counts charging theft concerning programs receiving federal funds (Counts 2 and 3), two counts of conspiracy to commit wire fraud (Counts 12, 18), two counts of mail fraud (Counts 25, 26), eight counts of wire fraud (27-34), seven counts of money laundering (Counts 35-41) and seven counts of submitting false statements (Counts 43-46, 48-50). In the PSR, the guideline calculations for Counts 12, 18, 25-34, 35-41 are subsumed in the calculation for the RICO conspiracy count. This is because the RICO guideline provision requires that the offense level be determined by the offense level applicable to the underlying racketeering activities. Moreover, each underlying racketeering act is to be treated as a separate count of conviction for purposes of guideline calculations. See PSR ¶ 63. The guidelines also require that these convictions be grouped under Chapter Three, Part D. The PSR combines these counts of convictions into three groups.

### Group One-Counts 12 and 18
### S.C. State Homecoming Concert and Sportsman Retreat Proposal

1. The Enhancement Under 2C1.1(b)(1) For the Value of Benefit  Is Incorrect.

The PSR groups Counts 12 and 18, charging wire fraud in connection with the South Carolina State University ("S.C. State") Homecoming Concert and the proposed purchase of Sportsman Retreat. The PSR accepts the Government's claim that the benefit amount to be used in the guideline calculation should be $123,226. According to the Government, Pinson was offered a new Porsche valued at $90,000 for his assistance with Richard Zahn's efforts to sell his Sportsman Retreat to S.C. State. The Government also claims that Pinson expected to receive $33,226 from the Homecoming Concert.  These amounts are incorrect.

The benefit amount for Sportsman's Retreat fails to account for the fact that Zahn had previously agreed to purchase Pinson a used Porsche valued at $35,000 as part of the joint

venture agreement between them relating to the re-development of the Gonzales Gardens low-income housing neighborhood in Columbia, S.C.  At trial, Zahn specifically testified that his first conversation with Pinson about purchasing a Porsche occurred well before there was any discussion about the Sportsman Retreat proposal.  Zahn testified that "a car was discussed as a car allowance in our original—was contemplated in our original conversations of our partnership at Gonzales Gardens." **Exhibit A**, Tr. Excerpts, 51:15-23.   Zahn further testified that the car allowance would be approximately $35,0000. Id. at 52:4-7.   Zahn also explained that the car allowance had nothing to do with S.C. State's purchase of Sportsman's Retreat. Id. at ll.8-11.[1] Zahn later explained in his trial testimony that the sale of Sportsman's Retreat directly to S.C. State would have allowed him to avoid paying a real estate commission and as a result he would then have sufficient cash available to purchase Pinson a new Porsche Cayenne, rather than a used one valued at $35,000. Id. at 132:3-20.  Furthermore, Zahn told the F.B.I. in a pre-trial interview that he was willing to buy Pinson a new Porsche Cayenne, rather than a used one valued at $35,000 which was more typical for his business, because Pinson was supposed help Zahn sell Sportsman's Retreat to S.C. State. **Exhibit B**, F.B.I. 302, Summary of Interview of R. Zahn, July 24, 2012, p. 3.

Section 2C1.1(b)(1) of the Guidelines provides for an enhancement based upon the "value of anything obtained or to be obtained by a public official."   United States Sentencing Commission, Guidelines Manual (Nov. 2014).  Because Zahn and Pinson had already agreed on the purchase of a used vehicle valued at $35,000, the value that Pinson allegedly was to obtain as

---

[1] The question that appears in the transcript is either improperly transcribed or the prosecutor misspoke. It reads "What did that [the car allowance] have to do with the South Carolina State purchase of Gonzales Gardens." S.C. State never considered purchasing Gonzales Gardens. Obviously, the point clearly made is that Pinson was entitled to a $35,000 car allowance for the purchase of a used Cayenne irrespective of whether S.C. State purchased Sportsman's Retreat.

a result of his assistance with the sale of Sportsman's Retreat to S.C. State is the difference in value between a new vehicle ($90,000) and a used vehicle ($35,000). This amount is $55,000.

The PSR also includes the Government's claim that Pinson expected to receive $33,226 from the profits of the Concert as the benefit value under Section 2C1.1(b)(1) for Pinson's involvement with Homecoming Concert. Unlike conduct relating to Sportsman's Retreat, the Homecoming Concert contract was awarded, the Concert was conducted and all monies from the Concert were distributed. The most that Pinson received in connection with the Homecoming Concert was $500. Pinson did not expect to receive any more money from the Homecoming Concert. Therefore, under Section 2C1.1(b)(1) the correct benefit value to be used is $500, the amount of money that Pinson is alleged to have actually received.

2. The PSR Improperly Tags Pinson as an Organizer and Leader of a Criminal Organization With Five or More Participants For the Group One Offenses.

The PSR concludes that Pinson was an organizer or leader of five or more criminal participants in relation to the criminal convictions involving the Sportsman's Retreat and Homecoming Concert deals. The evidence does not support such a finding. First, to be a "participant," the person must be criminally responsible for the commission of the offense. USSG §3B1.1, comment. (n.1). With regard to the Sportsman's Retreat land deal at S.C. State, there were only three participants: Richard Zahn, Michael Bartley and Jonathan Pinson. Moreover, Pinson was not the organizer or leader of this alleged criminal effort. Rather, Zahn organized the efforts to sell his property to S.C. State and he is the one that recruited both Bartley and Pinson, offering each one of them illegal gratuities for their assistance. If anyone was an organizer or leader, it was Zahn, not Pinson.

As to the Homecoming Concert, the jury concluded there were only two participants: Ed Givens and Jonathan Pinson. Thus, there were not more than five participants to support the

enhancement. Even if there were, the evidence does not support a finding that Pinson was either the organizer or leader of this effort. Rather, according to the Government's evidence, all parties were willing participants in the alleged scheme. Additionally, Pinson would not have received a greater share of the proceeds than the other participants in either alleged scheme.

To qualify for the enhancement, a defendant must exercise "some control over others." U.S. v. Mares-Molina, 913 F.2d 770 (9th Cir. 1990). Willing participants in a conspiracy are definitely not controlled. The case law rejecting role increases under these circumstances is clear. See, e.g., U.S. v. Katora, 981 F.2d 1398 (3d Cir. 1992) (finding that because coconspirators equally shared responsibility for creating and carrying out their wire fraud scheme and directed no culpable participants, neither could be called an organizer.) The government has to show that the defendant and four others were culpable participants and that the defendant directly supervised them during the course of the offense. The record would have to specify which participants the defendant supervised. United States v. Schweihs, 971 F.2d 1302, 1318 (7th Cir. 1992); see, e.g., United States v. Sayles, 296 F.3d 219, 225 (4th Cir. 2002) (reversing where the sole justification for the leadership or management increases was that defendants bought and sold crack), United States v. Jobe, 101 F3d 1046 (5th Cir. 1996) (reversing a role increase for a bank director who did not manage people in the scheme); United States v. Pagan, 196 F.3d 884, 893 (7th Cir. 1999) (stating leader's trust in defendant was insufficient for a managerial increase where there was no evidence that defendant directed the activities of anyone else); United States v. Glinton, 154 F.3d 1245, 1260 (11th Cir. 1998) (holding double hearsay statement that defendant called the two codefendants part of his "group" did not supports a finding that he supervised or managed them). Moreover, the fact that the defendant played an important or essential role in a criminal enterprise does not necessarily require an aggravating role adjustment.

See U.S. v. Litchfield, 959 F.2d 1514, 1522-23 (10th Cir. 1992) (noting that enhancement is for "organizers or leaders" not for "important or essential figures."); U.S. v. Sostre, 967 F.2d 728, 733 (1st Cir. 1992) (rejecting manager or supervisor adjuster for drug "steerer" who played an "essential role" in the drug transaction).

There is no evidence that Pinson was to get a greater share of the proceeds from either the Sportsman's Retreat sale or the Homecoming Concert. Rather, as to Sportsman's Retreat, clearly Zahn was in line to receive the most. Furthermore, Zahn had previously enlisted Bartley to assist him. Bartley introduced Zahn to Pinson and then Zahn sought to enlist Pinson's assistance by offering him a gratuity. As to the Homecoming Concert, it is clear that Givens was a very willing participant and enthusiastically sought and obtained a payment for his assistance. It strains credulity to find that Givens was controlled by Pinson in connection with Givens' involvement with the Homecoming Concert.

3. The Correct Guideline Calculation For Group One Results In An Offense Level of 26.

After reducing the value of the benefit received to $55,500 as required, and eliminating the role adjustment, the guideline calculation is:

| | |
|---|---|
| Base Offense Level | 14 |
| Specific Offense Characteristic-more than one bribe | 2 |
| Specific Offense Characteristic-value of benefit | 6 |
| Specific Offense Characteristic-position | 4 |
| Adjusted Offense Level | 26 |

**Group Two-Counts 25-34**
**VRE and Supremes Diaper Plant**

The guideline calculation for the counts grouped together under Group Two also incorporates the Government's incorrect financial claims. Counts 25-34 are grouped together and combine the alleged loss amounts relating to the Village at Rivers Edge (VRE) charges with the Supremes Diaper charges.

    1.  <u>The Amount of Loss Is Overstated.</u>

The PSR concludes that Pinson should be held accountable for a total loss amount of $118,110.68 relating to his role in the alleged Supremes Diaper plant scheme. However, the trial evidence only implicated Pinson with the payment of $62,100 to the Noel Group from Marion County. Furthermore, only $45,000 of this money was distributed among Lance Wright, Tony Williams, Jonathan Pinson, Phil Mims and Collin Brown. The remaining $17,100 was returned to the Supremes. Lastly, the evidence does not support the claim that Mims billed $41,010.68 for services that were not rendered. According to the finding in the PSR, $12,000 of this invoice was diverted to the Noel Group. However, the evidence at trial established that Pinson did in fact perform payroll services for the Supremes and that the Supremes ended up owing Pinson's firm more than $277,000 for payroll advances made on behalf of the Supremes. **Exhibit C**, 1.13.11 Ltr. to C. Brown, Defendant's Trial Exhibit 22. Under Application Note 3 (E) to Section 2B1.1 of the Guidelines, Pinson is entitled to a credit against the loss amount for services rendered prior to the detection of the alleged fraud. Thus, the appropriate amount to be included as a loss amount for the Supremes is at most $45,000 ($62,100-17,100).

In addition, there is absolutely no loss to HUD as claimed by the Government. The evidence clearly established that all work was completed prior to any disbursements being made by the Columbia Housing Authority (CHA). The issue at trial was whether VRE then paid its

contractor partner SK or held back more money than it was entitled under the agreement with SK. At trial, SK's president was unable to testify how much of the builder's profit SK had agreed to share with VRE. Moreover, SK's president also testified that his company did not lose money on the contract with VRE. Thus, there is no loss. Moreover, if SK did lose money under the agreement, it was not the result of fraud, but rather a contract dispute with VRE. The counts of conviction relate to submitting false statements representing that all subcontractors had been paid when the subcontractors had allegedly not been paid. This conduct however did not result in any loss to HUD.

Thus, the total loss amount that should be used for the guideline calculation of these Group Two offenses is $45,000, not $352,843.0.

2. The PSR Improperly Tags Pinson as an Organizer and Leader of a Criminal Organization With Five or More Participants For the Group Two Offenses.

The evidence does not support a finding that Pinson was an organizer or leader of an organization involving five or more participants in these Group Two offenses. As noted above, to be a "participant," the person must be criminally responsible for the commission of the offense. USSG §3B1.1, comment. (n.1). The offenses relating to the Diaper Plant and VRE involve the following participants: Lance Wright, Tony Williams, Phil Mims and Jonathan Pinson. There are less than five participants in these alleged offenses.

In addition, there is no justification for concluding that Jonathan Pinson was the organizer or leader over these participants regarding the diaper plant. The organizer/leader enhancement cannot be properly applied to Pinson simply because the funds were paid to Pinson's firm, the Noel Group. Being an organizer or leader is not the same as being essential or important to the completion of the offense. See Litchfield, 959 F.2d at 1522-23 (noting that enhancement is for "organizers or leaders" not for "important or essential figures."); Sostre, 967 F.2d at 733

(rejecting manager or supervisor adjuster for drug "steerer" who played an "essential role" in the drug transaction).

As to the VRE, Pinson was found guilty of representing on pay applications that all subcontractors had been paid. The jury concluded that these were false claims. The evidence at trial showed that Pinson signed all but a few of the pay applications. The ones that he did not sign were apparently not signed by anyone else either. Therefore, as to this conduct, there was simply no need for Pinson to supervise or lead anyone and he did not. Although Mims worked under Pinson and followed his direction regarding the development of the VRE, when it comes to the conduct for which Pinson was criminally charged, Mims was not a participant. Mims did not falsely represent that subcontractors had been paid. Furthermore, Mims was not responsible for paying the subcontractors, as this was done by SK Builders. Lastly, Mims was not responsible for paying SK Builders either. This obligation was owed by VRE and Pinson who was the managing member. Mims did not even have an ownership interest in VRE.

3. <u>The Correct Guideline Calculation For Group Two Results In An Offense Level of 13.</u>

After reducing the value of the benefit received to $45,000 as required, and eliminating the role adjustment, the guideline calculation is:

| | |
|---|---|
| Base Offense Level | 7 |
| Specific Offense Characteristic-loss amount of 45,000 | <u>6</u> |
| Adjusted Offense Level | 13 |

<h1 style="text-align:center">GROUP THREE COUNTS 35-41<br>MONEY LAUNDERING</h1>

The PSR calculates the guidelines under the Group Three money laundering offenses (Counts 35-41) by using the adjusted guideline level from Group Two as the base offense level. See PSR ¶¶ 80-81. In addition, two points are added to the base offense level because Pinson was convicted under 18 U.S.C. § 1956. Id. ¶ 82. Using the correct guideline calculation from the Group Two counts as the base offense level results in the following:

| | |
|---|---|
| Base Offense Level | 13 |
| Specific Offense Characteristics- Section 1956 conviction | 2 |
| Adjusted Offense Level | 15 |

**The Correct Guideline Calculation for RICO Conspiracy Is An Offense Level of 26**

Paragraph 89 of the PSR contains the grouping analysis for the predicate act offenses under Count 1.  Using the correct guideline calculation results in a total offense level of 26.

| Group # | Adjusted Offense Level | Units |
|---|---|---|
| One | 26 | 1 |
| Two | 13 | 0 |
| Three | 13 | 0 |
| Total Number of Units | | 1 |
| Greater of the Adjusted Offense Level | | 26 |
| Increase In offense Level | | 0 |
| Total Offense Level | | 26 |

**The Correct Guideline Calculation for Remaining Counts is an Offense Level of 14**

The remaining Counts, nos. 2 and 3, 43-46 and 48-50, are also grouped for guideline calculation purposes. These counts charge theft of government funds and making false

statements relating to the Supremes Diaper Plant and the VRE. The PSR also continues to apply the incorrect loss amount of between $123,226 and $148,226 for a ten level enhancement under Section 2B1.1(b)(1)(f). As discussed above, the loss amount to Marion County for the Supremes diaper plant for which Pinson should be held accountable is no more than $45,000 and there is no loss amount for the VRE. The resulting enhancement under 2B1.1(b)(1)(f) should be 6, rather than 10. The adjusted offense level should therefore be 14.

**B. The Correct Sentencing Range Under the Advisory Guidelines is 63 to 78 Months in Prison**

The correct total offense level under the advisory guidelines is 26. This is the highest offense level of all of the combined offenses. In addition, because this offense level is more than 9 levels higher than the next highest level, there are no additional points added under the grouping rules. Pinson is a Criminal History Category I. Thus, the resulting advisory sentencing range is a term of prison of between 63 to 78 months.

**II. THE COURT SHOULD GRANT A VARIANCE FROM THE GUIDELINE RANGE BASED ON THE CRITERIA OF 18 U.S.C. § 3553(a).**

After calculating the correct sentencing guideline range, the District Court must consider several factors to determine a reasonable sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the sentencing guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. See 18 U.S.C. § 3553(a).

**A. 18 U.S.C. §3553(a)(1)—The History and Characteristics of Defendant Jonathan Pinson and the Nature of the Offense.**

There is no better way to delve into the history and characteristics of  Pinson, than to hear from those people in the community who have known or encountered  Pinson during various intervals of his life. While the PSR provides the factual details of  Pinson's criminal conduct and the biographical outline of his life, the attached letters illustrate the character of a man who has worked hard to create a successful business, gave selflessly to his community, and nurtured the lives of his children, other young people and likewise supported friends in their times of need. The quality and depth of Pinson's character belies the criminal conviction which now taints his name.

There are several common themes echoed in the letters submitted on Pinson's behalf: devotion to his family, friends and faith; professionalism in business; and service and commitment to community. See **Exhibit D**, Collection of Letters.  These themes resonate as the qualities that define Pinson, even in the face of his conviction.

1. Devotion to his family, friends and faith

As the youngest of four children, Jonathan Pinson was raised in a close-knit family by his parents, Charles and Helen Pinson, who instilled good values in their children. **Exhibit D-1**, Letter of Charles Pinson, Sr. and **Exhibit D-2**, Letter of Louella D. Butler. With the closeness and harmony of his own family as a guide, a young Pinson sought to create a happy family for himself.  In 1988, while a student at South Carolina State University, Jonathan Pinson met and started dating Pamella. Together, they have raised "three beautiful children in a loving and faith-based environment.  Jonathan has played an integral role in keeping his children actively involved in church, sports and extracurricular activities." **Exhibit D-3**, Letter of Steve Benjamin. "He is a family man who spends a great deal of his time nurturing his kids. On any given

weekend, you will find Jonathan taking his daughters to a dance or gymnastics recital, or his son to a football practice. His family is a very important part of his life." **Exhibit D-4**, Letter of Timothy Drummond; **Exhibit D-5**, Letter of Emma Clark; **Exhibit D-6**, Letter of Pamella Pinson.

One poignant example of Jonathan Pinson's effect on his children comes from his sister-in-law Miriam Pinson who writes,

> I have witnessed several occasions when the kids were participating or competing in school functions or sporting events and it was Jonathan who calmed the nerves, who gave the pep talk that boosted confidence, who made eye contact with them and it was like speaking to their souls, who smiled beams of pride and hugged tightly to congratulate after at the finish line or performance, and who consoled with words of encouragement, a listening ear, and a shoulder to lean on when things didn't go quite as planned.

**Exhibit D-7**, Letter of Miriam Pinson. However, "Jonathan isn't just a superb dad to his own children but his infectious enthusiasm is a natural quality that makes other children want to be around him as well."  **Exhibit D-8**, Letter of Taketa Anderson.

"He is someone who puts God and his family first, friends and the common man are not far behind." **Exhibit D-9**, Letter of Tameika Devine. As an active member in the Valley Brook Outreach Baptist Church, Pinson has worked with Pastor Johnson "on several community enrichment projects ...." Pastor Johnson notes that "He was vital in helping me organize and execute our early years of the King Holiday weekend celebration and he helped the event secure some scholarships to benefit the youth of our community." **Exhibit D-10**, Letter of Pastor Curtis Johnson. "... Jonathan is a person who will involve himself in things that will be of benefit to his family and society as a whole in the future." **Exhibit D-11**, Letter of Pastor James W. Johnson.

According to St. Thomas Aquinas, "There is nothing on this earth to be prized more than

true friendship." "…[B]oth personally and professionally, Jonathan has consistently demonstrated incredible loyalty and integrity to anyone fortunate enough to be counted among his friends and family." **Exhibit D-12**, Letter of Mark Craig. Pinson is prized as a true friend by individuals who have submitted letters to the Court illustrating his acts of kindness and loyalty. **Exhibit D-13**, Letter of Frances G. Parker. Pinson's history of selfless generosity and friendship toward others reflects a characteristic which is ingrained in Pinson. Not only does Pinson devote time to his immediate family, but he gives of himself to those who are in need of companionship. Pinson has a history of regularly visiting a distant relative who resided in an assisted living facility, to provide her company. **Exhibit D-14**, Letter of Dorothy Walker. Jonathan Pinson's dedication to his family, friends and faith is genuine and is echoed by all who know him. **Exhibit D-15**, Letter of Angeline Smith; **Exhibit D-16**, Letter of Wanda Benbow-Smith; **Exhibit D-17**, Letter of Erin Parker; **Exhibit D-18**, Letter of Donald Smith; **Exhibit D-19**, Letter of Carolyn Goodjoin; **Exhibit D-20**, Letter of Littura Williams; and **Exhibit D-21**, Letter of Henry C. Harrison.

2. Professionalism in Business

After college, Jonathan Pinson returned home and worked in various fields before developing a staffing business, Pindrum Staffing, in Greenville, South Carolina. "Because of Jonathan's persistence, diligence and leadership, Pindrum Staffing Services would grow to become one of the largest minority-owned businesses in the state of South Carolina." **Exhibit D-22**, Letter of Orlando "Skip" Wright. He supervised hundreds of temporary employees at the BMW plant and "always treated each employee with the utmost respect and was a wonderful owner of the staffing company." **Exhibit D-23**, Letter of Vernie Anthony. Those close to him observed that he felt great pride in securing a staffing contract and thus having a role in placing

people with jobs. **Exhibit D-24**, Letter of Preston Smith.

Throughout Pinson's years involved in business, he has earned a reputation for responsiveness, sensitivity and commitment. **Exhibit D-25**, Letter of Diane E. Sumpter. He was considered a "hardworking and industrious person." **Exhibit D-26**, Letter of James T. McLawhorn, Jr. Jonathan Pinson's longtime neighbor and professional colleague Stan Vinson observes, "[f]rom a professional stand point, Jonathan always conducted himself in a way that most positively reflected on our company and personal ethics.... I know Jonathan Pinson and all his endeavors as a business partner were beyond reproach." **Exhibit D-27**, Letter of Stan Vinson.

3. <u>Service and Commitment to Community</u>

In 2004, Pinson was selected to participate in the first class of the Liberty Fellowship, South Carolina's premier leadership network. According to the founder of the organization, Pinson has "been a star in the Liberty Fellowship program from the beginning. He has led the intense seminar discussions, listening to the diversity of perspectives and wide range of thought among this group and always doing it with respect and civility." **Exhibit D-28**, Letter of Hayne Hipp. The Executive Director of the Liberty Fellowship similarly touts Jonathan as selfless and "an advocate for the disadvantaged." **Exhibit D-29**, Letter of Jennie M. Johnson. While involved in the two year Liberty Fellowship program, Pinson spent substantial blocks of time meeting with and discussing issues with the other fellows. Dalhi Myers reflects on that time with Pinson stating, "During our two years of organized Liberty programming, I spent weeks with Jonathan and learned to respect his integrity and intellect. We discussed confidential matters with our fellow Fellows, all very senior business leaders across South Carolina, and I was always struck by his commitment to community, others and hard work." **Exhibit D-30**, Letter of Dalhi

Myers. Another fellow describes Jonathan Pinson as "a humble business leader and a committed family man." **Exhibit D-31**, Letter of David Dukes.

Pinson has "been willing to volunteer his time and managerial skills to help several of our community organizations and boards grow and develop." **Exhibit D-32**, Letter of Rep. Leola Robinson-Simpson. He was involved in the "Greenville Chamber of Commerce, the Phyllis Wheatley Center, the Urban League of the Upstate, and the Peace Center for Performing Arts. **Exhibit D-3**, Letter of Steve Benjamin. Additionally, Pinson was involved with the South Carolina Cuban Delegation, Greenville Commerce Club, National Minority Supplier Development Council, and Greenville Hospital System. **Exhibit D-22**, Letter of Orlando "Skip" Wright. "Jonathan's undying commitment to change lives through mentoring youth and young adults, while making efforts to improve everyone's overall quality of life through service on boards and commissions" was notable. **Exhibit D-3**, Letter of Steve Benjamin. Jonathan Pinson's impact on his community should be recognized and this Court should consider imposition of required community service with young people in lieu of extended incarceration, as the benefits of his informal counseling appear to benefit many.

4. <u>Nature and Circumstances of the Offense</u>

The "nature and circumstances of the offense" also counsels a sentence well below the advisory guidelines for a number of reasons. First, Pinson did not profit personally from any of the alleged schemes involving S.C. State. At most he received $500 for the repayment of a loan from Eric Robinson. He received nothing from Zahn. Also, Givens, the government's cooperating witness, testified that Pinson put S.C. State's interest above Pinson's self-interest. This is evident from the wiretapped recorded conversations where Pinson explains that making money on the Concert was not the most important thing, but rather having events that were

attractive to the student body so that S.C. State could compete with other historical black colleges for students was of prime importance.  Regarding the Sportsman Retreat, the evidence was un-contradicted that S.C. State had an interest in purchasing this property well before Pinson got involved.  Also, Dr. Dale Wesson testified that he was interested in acquiring the property through the use of 1890 funding irrespective of Pinson's involvement.

As to the Village at Rivers Edge, it was obvious through the testimony at trial that Pinson simply lacked the experience and skills to take over this project after Mayor Benjamin withdrew. Pinson, who resides in Greenville, never planned to be the managing partner in this Columbia development.  Yet, he was thrust into this role by circumstance. He turned to Phil Mims who Pinson thought was capable and honest to run the day to day affairs of the project. Ultimately, Phil Mims abandoned the project. At the end, Jonathan Pinson single handedly saw the development through completion. Jonathan even conveyed all of his ownership interest in the development to satisfy the debt on the project so that it could be completed. The end result is that former blighted Roosevelt Village neighborhood is now a safe and clean community. Jonathan Pinson, at great personal expense, has made the City of Columbia better.

**B. 18 U.S.C. §3553(a)(2)(A) and (B)—The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense and the Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct**

A sentence well below the advisory guidelines, even a non-custodial sentence, will encompass substantial and meaningful punishment. The Court can impose significant community service conditions in fashioning an appropriate sentence.

**C. 18 U.S.C. §3553(a)(2)(C)—The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

We submit there is no realistic possibility that Jonathan Pinson will ever again be involved in any type of criminal conduct.

**D. 18 U.S.C. §3553(a)(2)(D)—The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

These factors are not pertinent in the sentencing of Jonathan Pinson, a college educated citizen who has distinguished himself with leadership roles in business and civic organizations.

**E. 18 U.S.C. §3553(a)(6)-The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct**

The need to avoid sentencing disparities is one of the most compelling factors justifying a significant variance from the advisory sentencing guidelines in this case. Courts look to sentencing disparities among co-defendants and others involved in the same criminal conduct, as well as national disparities. See United States v. Lazenby, 439 F.3d 928 (8th Cir. 2006) (district court should have given more weight to extreme disparity between codefendants' sentences; such disparity fails to serve the legislative intent of Section 3553(a)(6)); United States v. Conatser, 514 F.3d 508, 521 (6th Cir. 2008)(district court could, but was not required to, consider disparity between co-defendants); United States v. Frias, 521 F.3d 229 (2d Cir. 2008). Although disparity of length of sentences among co-defendants where the others plead guilty and cooperate is not grounds for a guideline departure, as opposed to a variance, even a guideline departure may be warranted when the disparity is the result of prosecutorial manipulation of the guidelines. United States v. Withers, 100 F.3d 1142, 1149 (4th Cir.1996); United States v. Johnson, 464 F. App'x 112, 115 (4th Cir. 2012).

This Court has only sentenced one other defendant who pled guilty to related conduct. Givens, pursuant to a plea agreement with the government, pled to one count of misprision of a felony. **Exhibit E,** E. Givens' Plea Agreement.  Givens was sentenced to 6 months of probation and given credit for the time he was on pre-trial supervision. As a result, Givens has already completed his term of probation and on February 25, 2015 the South Carolina Supreme Court reinstated Givens license to practice law.

As the Court is well aware, Givens was at the center of the alleged Homecoming Concert scheme. He should have been considered a public official for purposes of the sentencing guidelines, as Givens was the General Counsel to S.C. State.  Givens would also have received an enhancement under the guidelines for abuse of position of trust, had he been charged with the same offense that Pinson was charged with. Yet, the Government manipulated the guidelines by simply charging Givens with misprision of a felony, when the Government had the recorded taped conversations showing Givens was as involved in the Homecoming Concert deal as Pinson.  For Givens, this made the sentencing guideline range that Pinson is now facing simply disappear.

The Government has also agreed to recommend probation for other, and in our view more culpable, defendants who have pled guilty to related conduct. According Zahn's plea agreement, the Government agrees to advocate a 3 year probationary sentence. **Exhibit F**, R. Zahn's Plea Agreement. The Government has agreed to recommend a sentence of three years' probation for Lance Wright in a plea agreement where the Government and Wright agreed to an artificial guideline cap of $1 Million for Wright's multi-million dollar bank fraud scheme. **Exhibit G**, L. Wright's Plea Agreement.

The Court should also consider the disparity in sentences of statewide elected public officials in South Carolina. In March 2008, former State Treasurer Thomas Ravenel received a 10-month sentence in federal court on drug charges. **Exhibit H**, The Post and Courier, *Ravenel Sentenced on Federal Drug Charges*, March 15, 2008. Also in March, this time on March 10, 2012, Lieutenant Governor Ken Ard pled guilty to using campaign money for personal expenses and received 5-years of probation in State Court. **Exhibit I**, The State, *Ard Resigns, is Indicted, Gets Probation*, March 10, 2012. Lastly, in October 2014 pursuant to a joint agreement with State and federal prosecutors, the Speaker of the South Carolina House of Representatives, Bobby Harrell pled guilty to improperly using campaign funds for personal use and was sentenced to 3 years of probation. **Exhibit J**, The New York Times, *Harrell, South Carolina House Speaker, Pleads Guilty*, October 23, 2013.

Also, former State Representative Luther Taylor received 78 months after he was convicted by a jury for Hobbs Act vote selling violations.[2] Taylor's sentence was the longest sentence handed down following this State's most dramatic public corruption investigation involving elected public officials, "Lost Trust." United States v. Taylor, 956 F.Supp. 622, 624 (D.S.C. 1997). State Representative Larry Blanding, who was also convicted after a jury trial, was sentenced to 37 months in prison. Id. at 625. State Representative Paul Derrick was sentenced to 34 months in prison. Id. at 625. The other Lost Trust defendants who were convicted following a jury trial were never sentenced. State Representative BJ Gordon passed away before he was sentenced and State Representative Jefferson Marion "Bud" Long's conviction was vacated. The remaining Lost Trust defendants pled guilty, with the exception of State Representative Tim Wilkes, who was acquitted by a jury.

---

[2] Taylor's conviction was later over-turned on appeal. United States v. Taylor, 966 F.2d 830, 832 (4th Cir. 1992), adhered to on reh'g, 993 F.2d 382 (4th Cir. 1993).

Nationwide, sentences in other federal high profile public corruption cases have been far less than that which the Government seeks to impose against Pinson. Former New Orleans Mayor Ray Nagin was sentenced to 10 years in prison after a jury found him guilty of 20 of 21 counts of taking hundreds of thousands of dollars in bribes and other favors from businessmen. **Exhibit K**, Washington Post, *Former New Orleans Mayor Ray Nagin Sentenced to 10 years in Prison*, July 9, 2014. U.S. Representative Jesse Jackson, Jr. received a 30-month prison sentence after pleading guilty to felony fraud for using $750,000 in campaign funds for personal items. **Exhibit L**, New York Times, *Jesse Jackson Jr. Gets 30 Months, and His Wife 12, to Be Served at Separate Times*, August 14, 2013. Former Charlotte Mayor Patrick Cannon was sentenced to 44 months in prison after admitting to taking $50,000 in bribes from FBI agents. **Exhibit M**, The State, *Former NC Mayor Sentenced for Taking Bribes*, October 14, 2014. Lastly, in January 2015, former Virginia Governor Bob McDonnell was sentenced to 24 months in prison after he was convicted by a jury of receiving more than $165,000 and lavish gifts. His wife received 1 year and 1 day after the same jury convicted her. **Exhibit N**, USA Today, *Ex-Va. Governor Sentenced to 2 Years in Prison for Corruption*, January 6, 2015.

As is evident from the above, a significant variance from the correct advisory sentencing guideline range of 63 to 78 months is necessary. A sentence of anything more than the 24 month sentence that was recently handed down to the former Governor of Virginia will not only result in an unwarranted disparity but will likely be cannon fodder for those who publicly blast the inequality of our criminal justice system, especially in view of the probationary sentences recently received by two of South Carolina's highest ranking elected officials, the Lieutenant Governor and Speaker of the House of Representatives.

## <u>CONCLUSION</u>

In this case, there is no compelling need, based on the facts of the case to sentence Jonathan Pinson to a prolonged period of incarceration in order to satisfy consideration of the <u>Booker</u> factors. <u>Importantly</u>, it appears that all co-indictees will not suffer much time in prison, if at all. Therefore the potential disparity in sentencing must be analyzed and enure to the benefit of Pinson. Looking at Pinson's past, and the devastating impact that his conduct has had on his career and personal life, there are ample grounds on which to predict that personal rehabilitation is underway, and that recidivism is out of the realm of possibilities. <u>See</u> **Exhibit D-33**, Letter of J. Todd Rutherford and **Exhibit D-34**, Letter of Donald Gist.  Pinson has demonstrated a profound appreciation of the severity of his conduct. Thus, a substantial departure and/or variance from the advisory guideline range is both reasonable and appropriate.

**WHEREFORE**, for all the foregoing reasons, Pinson respectfully submits that a significant downward departure and/or variance is warranted in this case.


[SIGNATURE BLOCK ON FOLLOWING PAGE]

Respectfully submitted,

By:   *s/ James M. Griffin*
James M. Griffin, Fed ID 1053
Margaret N. Fox, Fed ID 10576
LEWIS, BABCOCK, & GRIFFIN LLP
P.O. Box 11208
Columbia, SC 29211
T: (803) 771.8000
F: (803) 733.3541
jmg@lbglegal.com
mnf@lbglegal.com

Brian Steel, *admitted pro hac*
THE STEEL LAW FIRM, P.C.
1800 Peachtree St, Ste 300
Atlanta, GA 30309
T: (404) 605.0023
F: (404) 352.5636
thesteellawfirm@msn.com

ATTORNEYS FOR JONATHAN N. PINSON

Columbia, South Carolina
April 21, 2015